UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

DANIEL J. FREY                                                CIVIL ACTION

VERSUS

BOARD OF SUPERVISORS OF                    NO.: 16-00489-BAJ-EWD
LOUISIANA STATE UNITIVERSITY &
A&M COLLEGE, ET AL.

## RULING AND ORDER

Before the Court is the **Motion for Summary Judgment (Doc. 49)** and **Supplemental Motion for Summary Judgment (Doc. 83)** filed by Defendants, seeking dismissal of Plaintiff's claims. Plaintiff opposes the motions. (Docs. 56 & 99). Jurisdiction is proper pursuant to 28 U.S.C. § 1331. For the following reasons, Defendants' motions are **GRANTED IN PART** and **DENIED IN PART**.

### I. BACKGROUND

Plaintiff, Dr. Daniel Frey, was a tenured professor at Louisiana State University ("LSU") School of Medicine's Surgery Department. (Doc 49-3 at p 19, ll. 3–11). Plaintiff had held a tenured position since 1997. (*Id.* p. 22, ll. 9–10). After being fired from LSU Health Sciences Center, New Orleans ("LSUHSC") on February 16, 2016, Plaintiff brought suit in state court, alleging denial of his substantive and procedural due process rights under the United States and Louisiana constitutions, as well as claims for breach of contract and wrongful termination under Louisiana law. (Doc. 1-1 at pp. 11–13). Defendants are the Board of Supervisors of Louisiana State University and A&M College ("LSU Board"), LSUHSC and Larry H. Hollier in

his official capacity as Chancellor of LSUHSC.[1] (*Id.* at p. 3). Defendants removed the case to federal court. (Doc. 1).

LSU's School of Medicine ("SOM") is a component of LSUHSC, which in turn is governed by the LSU Board (Doc. 49-1 at ¶ 2). The Chancellor of LSUHSC is Larry H. Hollier, and the chair of the surgery department is Dr. Robert Batson. (*Id.*). Dr. Steve Nelson is the Dean of the SOM. (*Id.*). Dr. Janis Letourneau is the Associate Dean for Faculty and Institutional Affairs. (*Id.*). Dr. Chappius is also a professor of surgery at the SOM. (*Id.*).

Pursuant to a 2010 letter of reassignment, which laid out Plaintiff's duties and compensation, Plaintiff worked at University Hospital and Clinics ("UHC")[2] in Lafayette, Louisiana. (Doc. 49-3 at p. 97, ll. 14–20). His duties included supervising residents and medical students at UHC. (Doc. 49-3 at p. 100, ll. 17–23). Plaintiff's other duties involved working in the transplant and general surgery clinic, remaining on call, and attending to administrative duties in New Orleans as Vice-Chair of the Department of Surgery. (Doc. 49-3 at p. 24, ll. 12–17; 49-3 at p. 107, ll. 15–21). For fiscal year 2014–15, Plaintiff's compensation came from a variety of sources: he received a base pay of $113,275 from LSUHSC and a supplement of $356,372, which was paid in large part by UHC pursuant to a resident supervision contract. (Doc. 49-

---

[1] The parties had agreed to a voluntary dismissal of Chancellor Hollier (Doc. 58); however, the Court vacated that dismissal and reinstated Chancellor Hollier as a defendant, (Doc. 80).

[2] UHC was formerly known as University Medical Center ("UMC"). (Doc. 49-3 at p. 97, ll. 18–22). Although the parties and documents switch between UHC and UMC, this Ruling will use UHC throughout for clarity.

5 at p. 1). Plaintiff received further compensation for work done with the Louisiana Organ Procurement Authority ("LOPA"). (Doc. 49-5 at p. 2).

In addition to seeing uninsured patients at UHC, Plaintiff also had the opportunity to run a private practice for insured patients through the LSU Healthcare Network, a private non-profit.[3] (Doc. 49-3 at pp. 69–70, ll. 1–25, 1–13). Until about October or November of 2014, Plaintiff saw all of his private patients at UHC. (Doc. 49-3 at pp. 101–02, ll. 23–25, 1–8). When UHC privatized and was taken over by Lafayette General Hospital in 2013, it closed the organ transplant program and closed the clinic where Plaintiff was seeing private patients. (Doc. 49-3 at pp. 103, 105, ll. 1–9, 20–22). Plaintiff subsequently opened his own clinic through the Healthcare Network to continue seeing his private patients. (Doc. 49-3 at p. 103, ll. 7–15). Plaintiff sought admitting privileges at Our Lady of Lourdes Regional Medical Center ("OLOL') in November 2014, when UHC stopped accepting the insurance plans used by Plaintiff's private patients. (Doc. 49-3 at p. 103, ll. 17–23). Plaintiff claims that he did this with the knowledge and approval of his supervisors at LSUHSC. (Doc. 49-3 at pp. 103–104, ll. 25, 1–4).

Plaintiff opened FreySurgical, his own private clinic, on July 1, 2015. (Doc. 49-4 at p. 69, ll. 21–24). To support his private clinic, he received admitting privileges through OLOL. (Doc. 49-2 at p. 77, ll. 12–15). Plaintiff claims that at the time he received these privileges he and Dr. Batson discussed a letter of reassignment under which he would continue to admit private patients at OLOL, but he would continue

---

[3] Additionally, LSUHSC allowed faculty to obtain outside employment with permission. (Doc. 49-3 at pp. 69–70, ll. 1–25, 1–13).

3

to take on administrative duties and teach residents at UHC. (Doc. 49-4 at pp. 77–78, ll. 17–25, 1–17). Plaintiff notes that Lafayette General, which operates UHC, and OLOL are direct competitors. (Doc. 49-4 at p. 81, ll. 3–7). No other surgeons employed by LSUHSC practiced at OLOL. (Doc. 49-4 at p. 81, ll. 8–23). However, Plaintiff maintains that other faculty members were allowed to see patients at hospitals where LSUHSC did not have residents, including OLOL. (Doc. 56-7, pp. 60–61, ll. 1–25, 1; Doc. 56-11 p. 204, ll. 14–24).

Previously, in 2013, Plaintiff had applied for admitting privileges at Lafayette General, but he voluntarily withdrew that application when "they . . . found out about . . . disruptive physician [complaints] and going to PULSE . . . and they started raising questions." (Doc. 49-3 at pp. 105–06, ll. 15–25, 1–4). PULSE, the Physicians Universal Leadership Skills Education program, is a personal behavior program that Plaintiff agreed to attend and successfully completed after he had received complaints about his professionalism 2008. (Doc. 49-5 at p. 19). Plaintiff explained that he had not divulged the complaints against him or his participation in the PULSE program when he applied for admitting privileges at Lafayette General, but he maintains that he elected to not do so because he believed that completion of the PULSE program meant that he no longer had to report the incidents. (Doc. 106 at p. 106, ll. 5–21).

On April 21, 2015, Plaintiff received an emailed notice of complaints made against him at UHC. (Doc. 49-3 at p. 122, ll. 14–23; Doc. 49-5 at p. 4). In one, a medical student in her residency alleged that Plaintiff entered an examination room without introducing himself and conducted a breast examination of the patient. (Doc.

4

49-3 at pp. 124–25, ll. 6–25, 1–10). The other complaints involved Plaintiff allegedly behaving in a disrespectful manner and being dilatory seeing patients. (Doc. 49-5 at p. 4). After Plaintiff received the email notifying him of the complaints, he sent an email to Dr. Chappuis stating that he wanted to resign his privileges at UHC.[4] (Doc. 49-3 at pp. 123, ll. 10–15; Doc. 49-5 at p. 4). Plaintiff also met with Dr. Chappuis, who told him "to think it over." (Doc. 49-3 at p. 123, ll. 19–22). During his deposition, Plaintiff stated that the reason he wanted to resign rather than responding to the complaints was because "[i]t had become obvious . . . that the administration at UHC did not want me there anymore." (Doc. 49-3 at p. 132, ll. 23–25).

Shortly after Plaintiff resigned his privileges at UHC, LSUHSC informed Plaintiff that it considered his resignation of privileges at UHC as a resignation from his position at the SOM. (Doc. 49-3 at p. 137, ll. 1–16; Doc. 49-5 at p. 13). Plaintiff stated that he did not wish to resign his SOM faculty position; however, he was placed on leave without pay. (Doc. 49-3 at pp. 139–40, 149–50, ll. 18–25, 1–9, 25, 1–4; Doc. 49-5 at p. 13). Plaintiff then asked for his UHC privileges to be reinstated, which occurred shortly after he rescinded his letter of resignation. (Doc. 49-3 at pp. 149–50, ll. 9–25, 1–8; Doc. 49-5 at p. 14). Plaintiff received retroactive pay for the time he was suspended. (Doc. 49-3 at p. 150, 9–15). However, Plaintiff was told that his reinstatement was only temporary, with the understanding that Plaintiff would voluntarily resign his privileges by July 1, 2015. (Doc. 49-4 at p. 3, ll. 19–23).

---

[4] Privileges are the authority or approval for a doctor to practice at a particular hospital. (Doc. 49-3 at p. 136, ll. 14–18).

Plaintiff maintains that he believed the parties would then work towards a new letter of reassignment, where he would be assigned new duties outside of UHC. (Doc. 49-4 at pp. 3–4, ll. 24–25, 1–13; Doc. 49-5 at p. 15). LSUHSC and Plaintiff entered into negotiations in an attempt to reach a mutually agreed upon reassignment. (Doc. 49-5 at p. 15). LSUHSC offered to increase Plaintiff's time in New Orleans and increase his administrative duties. (Doc. 49-3 at pp. 143–44, ll. 11–25, 1–21).

On May 29, Plaintiff was placed on administrative leave. (Doc. 49-4 at p. 5, ll. 19–24; Doc. 49-5 at p. 17). Plaintiff remained on administrative leave until his termination by Defendants in February 2016. (Doc. 56–7, p. 233, ll. 18–24). While on administrative leave, Plaintiff continued to receive his base salary and was paid for his work with the LOPA. (Doc. 49-5 at p. 17).

Ultimately, Plaintiff and LSUHSC were unable to reach an agreement, and LSUHSC decided to move forward with termination. (Doc. 49-33 at pp. 12–13, ll. 14-25, 1–17). By letter dated June 29, 2015, LSUHSC formally notified Plaintiff of its intention to terminate him for cause. (Doc. 49-4 at pp. 12–13, ll. 14–25, 1–17). The stated reasons for termination were that Plaintiff's resignation from UHC purportedly placed him in breach of his reassignment letter and the alleged "acts of unprofessional conduct." (Doc. 49-5 at pp. 19–20).

LSUHSC used the following procedure to effectuate Plaintiff's termination: Plaintiff was given written notice of the basis of his termination along with the documents and witnesses that supported the grounds of his termination. (Doc. 49-4 at pp. 52–53, ll. 17–25, 1–9; Doc. 56-11 at pp. 86–87). An ad hoc committee of members

6

of the SOM were appointed to review the termination and to issue an advisory opinion. (Doc. 49-4 at p. 52, ll. 10–25). The committee held a hearing on September 1, 2015, where LSUHSC and Plaintiff called witnesses and submitted documents. (Doc. 49-4 at pp. 55–57, ll. 4–8, 7–25, 1–5). The hearing was observed by a representative of the American Association of University Professors ("AAUP"). (Doc. 49-4 at p. 57, ll. 6–12). The hearing committee unanimously decided not to recommend termination. (Doc. 49-14 at p. 45). The committee concluded there was no basis for termination because "[t]he reason for termination . . . was stated to be resignation of [Plaintiff's] UHC privileges, when in fact, [Plaintiff's] surgery practice was no longer being supported by UHC. He had already moved to a different facility in order to continue to care for his patients." (*Id.*). Further, the committee found that "[n]o evidence was produced to support the allegation of inappropriate behavior by [Plaintiff]." (*Id.*). During a deposition, Plaintiff was asked if "the way the committee was conducted complied with the LSU faculty handbook," to which he replied "[y]es, ma'am." (Doc. 49-4 at pp. 57–58, ll. 20–24, ll. 1–3).[5]

Under LSUHSC's procedures, the Dean had the right to accept, reject, or modify the committee's findings. (Doc. 56–3 at p. 57). On September 16, 2015, Dr. Nelson, the dean of the SOM, issued a letter to Plaintiff notifying him that he accepted the findings of the committee and that "a letter of reassignment w[ould] be forthcoming." (Doc. 49-14 at p. 46). According to Defendants, during this time period the parties continued to work towards reaching a mutual reassignment agreement

---

[5] Plaintiff does, however, claim that LSUHSC violated the faculty handbook by placing him on leave before the hearing was conducted. (Doc. 49-4 at p. 72, ll. 6–19).

7

but ultimately were unable to reach an agreement. (Doc. 56–7, p. 231, ll. 18–27). Plaintiff contends that he reached a verbal agreement with Dr. Nelson that was subsequently changed to become more onerous. (Doc. 56–7, p. 231, ll. 18–27). LSUHSC has no written policy concerning the reassignment process. (Nelson p. 77, ll. 6–12; pp. 305–06, ll. 21–25, 1). However, LSUHSC had traditionally issued letters of reassignment that were negotiated between the faculty member and LSUHSC. (Doc. 49-12 p. 44, ll. 22–24; Doc. 49-10 p. 109, ll. 3–12; Doc. 49-7 p. 76, ll. 1–13; Doc. 49-12 p. 31, ll. 11–21).

Regardless, it is undisputed that in October 20, 2015, LSUHSC issued a unilateral letter of reassignment to Plaintiff. (Doc. 49-5 at pp. 33–34). That letter placed the following conditions on Plaintiff: that he close FreySurgical, cease any clinical activity at OLOL, and take on additional duties in New Orleans. (*Id.* at 33). Plaintiff also claims that the orders to shut down FreySurgical and to stop seeing patients were unreasonable because it could have led to the abandonment of his patients.[6] (Doc. 49-9, p. 158, l. 22 – p. 159, l. 10; p. 163, ll. 3-11; p. 168, l. 22 – p. 169, l. 25). He also claims that he received conflicting orders regarding the shutting down of his practice. (Doc. 49-4, p. 164, l. 25 – p. 166, l. 25; p. 167, l. 18 – p. 169, l. 3). Plaintiff continued to treat his patients in his private practice. Doc. 49-8, p. 170, l. 8 p. 172, l. 3). When Plaintiff refused to comply with all the terms of the reassignment,

---

[6] Plaintiff asserts that he contacted Dr. Fontenot and Kathy Debruhl, the lawyer for the Healthcare Network, and that they claimed that if he stops seeing his patients he could be found to have abandoned them. (Doc. 49-4 at p. 21, l. 1–6).

8

LSU notified Plaintiff that he was being terminated.[7] (Doc. 49-5 at p. 35). Plaintiff requested a termination hearing, which LSU denied because he had previously had a hearing in September 2015. (*Id.* at pp. 38–44, 51). In February of 2016, Plaintiff was terminated from LSUHSC. (*Id.* at p. 35).

## II. LEGAL STANDARD

Pursuant to the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether the movant is entitled to summary judgment, the court views the facts in the light most favorable to the non-movant and draws all reasonable inferences in the non-movant's favor. *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997).

After a motion for summary judgment is filed, the non-movant "must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal citations omitted). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Austin v. Kroger Tex., L.P.*, 846 F.3d 326, 328 (5th Cir. 2017) (quoting Gates, 537 F.3d at 417). At this stage, however, the court does not evaluate the credibility of witnesses, weigh the evidence, or resolve factual disputes. *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).

---

[7] Plaintiff disputes whether he had to accept the reassignment. (Doc. 56-10 p. 309, ll. 6–24; Doc. 49-16).

9

On the other hand, the non-movant's burden is not satisfied by some metaphysical doubt as to the material facts, or by conclusory allegations, unsubstantiated assertions, or a mere scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (internal quotations omitted). Summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, summary judgment will lie only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." *Sherman v. Hallbauer*, 455 F.2d 1236, 1241 (5th Cir. 1972).

III. DISCUSSION

A. Procedural Questions

*1. Legal Capacity of LSUHSC*

Defendants claim that LSUHSC is not a proper party to this suit because it is not a legal entity capable of suing and being sued. (Doc. 83-1 at pp. 1–2), Under Louisiana Law, the LSU Board "is the post-secondary management board" that oversees and manages LSUHSC, retaining the capacity to "[s]ue and be sued" for "any university and college under its management." La. Const. art. VIII, § 7; La. Rev. Stat. ann. §§ 17:3215, 3351(a)(1). LSUHSC accordingly lacks the capacity to sue and be sued. *Raj v. La. State Univ.*, No. 11-1126, 2012 WL 629954, at *2 (E.D. La. Feb. 27, 2012), *aff'd*, 714 F.3d 322 (5th Cir. 2013); *see also Delahoussaye v. City of New Iberia*,

937 F.2d 144, 148 (5th Cir. 1991). Therefore, all claims against LSUHSC are **DISMISSED**.

### 2. *Legal Capacity for § 1983 Claims*

Defendants argue that neither the LSU Board not Chancellor Hollier are persons within the meaning of 42 U.S.C. § 1983. (Doc. 49-2 at pp. 9–10; Doc. 83-1 at p.3). Although Defendants are generally correct that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983," a state official sued in his or her official capacity for prospective relief is a person under § 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 71 n.10 (1989). "[A] request for reinstatement is . . . a claim for prospective relief designed to end a continuing violation of federal law." *Nelson v. Univ. of Tex. at Dall.*, 535 F.3d 318, 324 (5th Cir. 2008).

The LSU Board is an arm of the state and, as such, cannot be sued under § 1983. *See Raj*, 714 F.3d at 328. Likewise, Chancellor Hollier, who was sued only in his official capacity, cannot be sued for damages—punitive or otherwise—under § 1983. However, Plaintiff's request for prospective, injunctive relief may under § 1983 proceed against Dr. Hollier in his official capacity. *See Nelson*, 535 F.3d at 324.

### B. Federal Law Claims

### 1. *Procedural Due Process*

Plaintiff argues that "there are numerous genuine issues of material fact on the very issue of what due process rights [he] was entitled to under LSUHSC's policies and whether he, in fact, received those rights." (Doc. 56 at pp. 13–14). But for a

procedural due process claim, the relevant consideration is whether Plaintiff received the "constitutional minima," not whether LSUHSC complied with its own policies. *Brown v. Tex. A&M Univ.*, 804 F.2d 327, 335 (5th Cir. 1986).

Although there is a "need for some form of pretermination hearing" before a tenured employee is fired, the procedure "need not be elaborate." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542, 545 (1985). "Procedural due process entitles a public employee with a property right in his employment to notice of the charges against the employee, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Fowler v. Smith*, 68 F.3d 124, 127 (5th Cir. 1995); *see also Loudermill,* 470 U.S. at 546. Failure to comply with internal policies does not establish a violation of procedural due process as a matter of law. *Brown.*, 804 F.2d at 335; *Levitt v. Univ. of Tex. at El Paso*, 759 F.2d 1224, 1230 (5th Cir. 1985).

The parties do not dispute that Plaintiff was a tenured employee who held "a protected teaching appointment until retirement or dismissal for cause." (Doc. 49-2 at p. 18). Plaintiff accordingly had a protected property right in his employment and, as such, was entitled to a termination hearing.

The key question is whether the termination hearing held on September 2, 2015, was sufficient to fire Plaintiff after he refused to accept the reassignment. Defendants argue that there was no need for a second hearing because there were no facts in dispute—Plaintiff refused to abide by the unilateral letter of reassignment and, accordingly, was fired. (Doc. 49-1 at p. 10). However, as Plaintiff notes, the stated reasons for termination in February 2016 were different than the charges that Defendants brought against him in September 2015. (Doc. 49-5 at p. 33). Moreover,

12

Defendants had already accepted the unanimous finding of the ad hoc committee. Setting aside momentarily the question of whether LSUHSC violated its own rules,[8] there is a material dispute of fact concerning the circumstances leading to Plaintiff's termination in February of 2016. Moreover, the law appears unsettled regarding whether Plaintiff was entitled to a second termination hearing.[9] *See Fowler*, 68 F.3d at 127.

### 2. *Substantive Due Process*

"Public officials violate substantive due process rights if they act arbitrarily or capriciously." *Finch v. Fort Bend Indep. Sch. Dist.*, 333 F.3d 555, 562–63 (5th Cir. 2003). Because Plaintiff has not alleged that he was fired for the exercise of his constitutional rights, the Court need only find that the employer's "action was a rational means of advancing a legitimate government purpose." *Id.* at 563.

The Court finds that based on Plaintiff's voluntary resignation of his privileges from UHC, which placed him in violation of the 2010 reassignment letter, Defendants did not act arbitrarily or capriciously in suspending and subsequently terminating him. Additionally, Plaintiff has failed to show that Defendants acted arbitrarily and capriciously in denying his requests to continue working at OLOL. LSUHSC had a contract with Lafayette General, which Plaintiff admitted was a competitor.

---

[8] Even if Defendants' treatment of Plaintiff passed constitutional muster, failure to abide by their written policy "may constitute a breach of contract or violation of state law." *Levitt v. Univ. of Tex. at El Paso*, 759 F.2d 1224, 1230 (5th Cir. 1985).

[9] The Court notes that Defendants did not argue that their response to Plaintiff's grievance letter, which set out his position for why termination was inappropriate (*See* Doc. 49-4 at p. 39–44) after he received his second notice of termination, supplied sufficient due process. The Court believes this is a close call; however, Courts generally avoid granting summary judgment on grounds not raised by the parties. *LeBeouf v. Manning*, No. CIV.A. 12-2583, 2015 WL 3650797, at *6–7 (E.D. La. June 11, 2015)

Although LSUHSC could have allowed him to continue working at OLOL, Plaintiff has failed to show how Defendants' denial of his request was irrational. *See Finch*, 333 F.3d at 563. Accordingly, Plaintiff's substantive due process claim is **DISMISSED**.

**C. State Law Claims**

Plaintiff brings state law claims for breach of contract and wrongful termination. Ordinarily, in federal court, all supplemental state law claims against a state must be dismissed under the doctrine of sovereign immunity. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984); *see also Raj*, 714 F.3d at 329; *Pham v. Univ. of La. at Monroe*, No. 16-00467, 2016 WL 3172882, at *6 (W.D. La. June 6, 2016), *aff'd sub nom Pham v. Blaylock*, 712 F. App'x 360, 363 (5th Cir. 2017). However, when a state removes a lawsuit to federal court, it waives sovereign immunity for state law claims for which it has waived immunity in state court. *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 624 (2002); *Meyers ex rel. Benzing v. Texas*, 410 F.3d 236, 242 (5th Cir. 2005). Louisiana has waived its sovereign immunity for claims arising out of breach of contract or tort in Louisiana state courts. La. Const. art. XII, § 10(A); La. Rev. Stat. ann. § 13:5106(A). Therefore, those claims may proceed here.

*1. Breach of Contract and Wrongful Termination*

"Contracts have the effect of law for the parties and may be dissolved only through the consent of the parties or on grounds provided by law." La. Civ. Code art. 1983. Courts are to interpret the contract in accordance with the common intent of the parties. *Id.* at art. 2045. "When the words of a contract are clear and explicit and

lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." *Id.* at art. 2046. "Only where the terms of the agreement are unclear, ambiguous or will lead to absurd consequences may the court go beyond the original agreement to determine the true intent of the parties." *Eiche v. E. Baton Rouge Par. Sch. Bd.*, 623 So. 2d 167, 169 (La. App. 1st Cir. 1993). Summary judgment is seldom appropriate where there is a question as to what was intended by certain provisions of a contract. *Id.* at p. 170. In Louisiana, tenure provisions in a faculty handbook are contractually enforceable. *See Olivier v. Xavier Univ.*, 553 So. 2d 1004, 1007–08 (La. App. 4th Cir. 1989). Unless the LSU Board explicitly adopts the AAUP guidelines, those guidelines do not apply to Plaintiff's termination procedure. *See Id.* at 1008. Additionally, an employer who wrongfully terminates an employee is liable for the damages he suffers as a result of that termination. La. Civ. Code art. 2315.

Plaintiff has not met his burden of showing that the AAUP procedures apply, therefore the only question remaining is whether the faculty handbook procedures were followed. As the Court noted in its procedural due process discussion, it is unclear from the plain language of the faculty handbook whether Plaintiff was entitled to a second hearing after the Dean accepted the findings of the ad hoc committee recommending Plaintiff not be fired. The alleged reason for termination in February 2016 differed from the stated reasons in his previous hearing. (Doc. 49-5 at pp. 33–44). Accordingly, Plaintiff's claim for breach of contract regarding the faculty handbook may proceed. *See Olivier*, 553 So.

However, Plaintiff may not bring a breach of contract claim for any alleged breach of the 2010 reassignment letter nor for any alleged agreement with Dr. Batson

15

regarding a new letter of reassignment. Plaintiff breached the 2010 letter by resigning his UHC privileges, and Plaintiff admitted that Dr. Batson did not have the authority to approve a new reassignment contract. (Doc. 49-3 at pp. 1–4).

IV. CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. 49) is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that LSUHSC is **DISMISSED** as a party to this case.

**IT IS FURTHER ORDERED** that Plaintiff's substantive due process claims are **DISMISSED**.

**IT IS FURTHER ORDERED** that Defendants' Supplemental Motion for Summary Judgment (Doc. 83) is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that Plaintiff's claims for punitive damages are **DISMISSED**.

Baton Rouge, Louisiana, this 23rd day of August, 2018.

BRIAN A. JACKSON, DISTRICT JUDGE
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA